UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | CRIMINAL NO. 3:19cr64(VLB) |
| | : | |
| **v.** | : | |
| | : | |
| **RAMEL GENERAL** | : | JULY 16, 2020 |

### GOVERNMENT'S SENTENCING MEMORANDUM

The Government respectfully submits this memorandum in connection with the sentencing of defendant Ramel General (hereafter referred to as "General" or "the defendant"), which is currently scheduled for July 29, 2020. For the reasons discussed herein, the Government believes a Guidelines sentence is appropriate in the instant matter.

### Summary of Investigation

The underlying investigation in this case stems from a joint investigation by the Hartford DEA, Connecticut Statewide Narcotics Taskforce, the New London, Waterford, Groton City, Stonington Police Departments, and the Connecticut Department of Corrections into unlawful activity, including acts of violence, firearms offenses, drug distribution, and money laundering by members of the Elm Street Niggas otherwise known as ESN, in New London, Connecticut.

The investigation involved numerous controlled purchases of heroin, cocaine, and cocaine base by different confidential informants, walled-off stops including one that resulted in the seizure of a kilogram of cocaine, and, ultimately, the use of court-authorized wiretaps on a total of 4 phones held by

1

Whyte and Allgood from November 2018 until February 21, 2019.

The intercepted communications revealed that the conspirators worked together to distribute cocaine base, cocaine, fentanyl, and heroin in the New London/Norwich area. Many of the intercepts are explicit, containing terms like "soft" (cocaine), "hard" (cocaine base), "bizzie" (3.5 grams of narcotics/eighth of an ounce), "dog food" (heroin), "girl" (cocaine), "Becky" (cocaine) "the F" (fentanyl), "work" (narcotics), and "bread" (cash/narcotics proceeds). Other intercepts are more cryptic, containing references to a desire to "link up" or "get with you" (meet to obtain narcotics) that when viewed in context with other intercepted communications, references to quantity and/or price, surveillance, or seizures, establish the communication's criminal content. The intercepts are supported by physical seizures as well as officer surveillance and pole camera footage. The date range for the conspiracy is the first controlled buy from Allgood through the arrest date.

The members of the conspiracy fit into the prototypical, hierarchical, drug conspiracy framework: Whyte distributed cocaine/heroin/fentanyl/cocaine base to Allgood, Forbes, Davis, Feldman, Aggray McCleod, Jeremy Sanborn, Emilio Rodriguez, Ronald Ketter, Sasha Swain, and Earlene Dudley. General worked closely with Whyte, distributing cocaine at Whyte's direction (and in Whyte's absence) and assisting in maintaining the primary distribution location-an apartment complex managed by Amy Sarcia. Whyte obtained his narcotics from Gordon (cocaine and pills), Marquez (pills, fentanyl, and heroin), Cameron

(cocaine) and an unknown third party in Florida (cocaine). Whyte utilized female drug couriers, Jackie Hernandez and Holly Butler, to transport kilograms of cocaine purchased from Gordon from New York to Connecticut. Whyte utilized Dilma Silva, who is also a cocaine and heroin/fentanyl street-level distributor, to obtain fentanyl/heroin from Marquez. Dilma Silva was also arrested on February 13, 2019, with over 700 gross grams of cocaine after a brief trip to Panama. Intercepted communications evidence that Whyte had sent another DTO member to pick up Silva and the second female from the airport with the cocaine. Allgood, Forbes, Davis, Feldman, Aggray McCleod, Jeremy Sanborn, Emilio Rodriguez, Ronald Ketter, Earlene Dudley, and Bryan McClellan, in turn, distributed directly to users and other street-level distributors.

From communications intercepted over Allgood's phones, we identified Rayquan Stokley, Vidal Princetafari, Bryan McClellan and Emilio Rodriguez, as some of Allgood's re-distribution weight customers. Allgood and Whyte each worked closely with a partner. Allgood worked with Victor Encarnacion. As noted above, Whyte worked with Ramel General.

On the financial side, Sarcia was Whyte's landlord. Sarcia is the Building Manager for the apartment complex in which Whyte resides as well as the owner operator of Two Wives Pizza, a business located in the same building as the apartment complex. Sarcia utilized Two Wives to launder narcotics proceeds for Whyte. Intercepted communications evidenced Sarcia's involvement in the DTO by allowing Whyte to possess and utilize multiple units in the apartment complex

to store narcotics. As noted above, the apartment complex was also the primary distribution location utilized by Whyte and General. At the time of his arrest, law enforcement also seized substantial quantities of narcotics as well as ten firearms from Whyte from this apartment complex.

## Procedural history

On March 5, 2019, a federal grand jury returned a twenty-two-count indictment against defendant General and twenty-three co-defendants. Dkt. 29. On May 28, 2019, the Government filed a motion to revoke the defendant's bond following his arrest on state charges. Dkt. 288. During the hearing on June 4, 2019, the defendant consented to detention and the Court revoked his bond. Doc. 310, 386.[1]

On August 6, 20y19, the grand jury returned a superseding indictment that added two additional defendants to the narcotics conspiracy charge as well as additional counts that charged defendant General's codefendants with substantive offenses. Dkt. 427. On October 23, 2019, the grand jury returned a second superseding indictment that added possession of forty grams or more of fentanyl to one of the substantive narcotics charges against defendant Whyte (Count Seventeen in the Indictment, Count Eight in the Second Superseding Indictment) and corrected a typographical error in the charge alleging possession of a firearm in furtherance of a drug trafficking crime (Count Eighteen in the

---

1 On June 24, 2020, the Court thereafter denied the defendant's motion for bond. Dkt. 1078, 1173.

Indictment, Count Nine in the Second Superseding Indictment). Dkt. 704.

On March 6, 2020, General pled guilty to conspiracy to distribute and possession with the intent to distribute 500 grams or more of cocaine. Dkt. 994, 997. The parties agreed in their plea agreement that: (a) the defendant fell within Criminal History Category V, (b) the defendant's base offense level is 30, based upon a stipulated quantity of at least 5 kilograms but less than 15 kilograms of cocaine, and (c) 3 levels would be subtracted under U.S.S.G. § 3E1.1 for acceptance of responsibility, resulting in an adjusted offense level of 27. The parties further agreed that a total offense level of 27 in Criminal History Category V resulted in a Guideline range of imprisonment of 120 to 150 months, of which 60 months is mandatory, and a term of supervised release of at least 4 years up to a lifetime term of supervised release.

## The Presentence Report

The Probation Department has issued a Presentence Report (PSR) that finds the defendant's Criminal History Category to be VI, which resulted in a higher Guidelines range (130 to 162 months imprisonment), both of which are higher than agreed by the parties in their plea agreement. PSR ¶¶ 34-43; 57; 94. The Government does not have any objections to the Guidelines range calculated in the PSR.[2]

---

[2] If the Court accepts the Criminal History Category calculations set forth in the PSR, the Government requests that the Court give effect to the Guidelines range calculated in the parties' plea agreement pursuant to *United States v. Fernandez*, 844 F.2d 1138 (2d Cir. 1989).

## A Guidelines Sentence is Reasonable
## in Light of the Sentencing Factors

The defendant's conduct in undeniably serious. The tragic toll drug abuse wrecks on our communality is undisputable. In this context, the defendant's crime was far from a victimless one. He was putting poison into his community and helping to perpetuate the horrible cycle of crime, violence, addiction, and suffering at the center of drug abuse.

With respect to the defendant's history and characteristics, although the defendant suffered trauma, educational delays, and mental health concerns in his early life [PSR ¶¶ 64, 82, 84], there are no events in the defendant's history that warrant a departure from the Guideline ranges. Most significantly, at the time the defendant committed the instant offense he was a grown man of thirty-six years and a father. Further, despite experiencing trauma, struggling with substance and alcohol abuse for years, and being diagnosed with mental health concerns, the defendant has "never participated in mental health counselling or treatment," [PSR ¶ 83] and cared so little about probation mandated treatment that he could not even recall when he had purportedly participated in the programs [PSR ¶ 79]. The defendant alone is responsible for his actions and inaction.

It is also significant that, notwithstanding his firsthand knowledge regarding the violence, abuse, and poverty too often associated with narcotics distribution, the defendant elected to sell drugs himself, thereby exploiting his customers' addiction without any regarding for the harm he caused to his

6

customers, their families, or his own loved ones. As evidenced by his lawful employment, which could be described as sporadic and unverified [PSR ¶¶ 86-89], the defendant has supported himself for years by exploiting drug addiction and profiting from the narcotics trade.

The defendant's criminal history is a significant factor and, unfortunately, the defendant has extensive experience with the criminal judicial system. Indeed, the PSR reflects a pattern of arrests from age 18 in 2000 to age 33 in 2015. PSR ¶¶ 46-56. In total, the defendant has ten prior convictions, along with two separate pending charges. PSR ¶¶ 46-60. The defendant has three prior convictions that involve a controlled substance. PSR ¶ 54 (reflecting 2007 sale of narcotics conviction); PSR ¶ 50 (reflecting 2002 conviction for possession of narcotics); PSR ¶ 46 (reflecting 2000 conviction for possession of marijuana). One of his prior convictions involved the unlawful possession of a firearm [PSR ¶ 53], which is serious in its own right but, when possessed by one with the defendant's criminal history and willingness to engage in criminal conduct such as the instant offense, is exceedingly dangerous to the public. Moreover, the defendant's <u>three</u> convictions for operating while under the influence (DUI) are a staggering example of his willingness to place every single other driver on the road at peril. PSR ¶ 47 (2001 DUI conviction); PSR ¶ 55 (2013 DUI conviction); PSR ¶ 56 (2015 DUI conviction). His two convictions for violation of a protective order [PSR ¶¶ 51-52] and his pending charges [PSR ¶¶ 59-60] evidence a clear, unwavering disrespect for authority and a propensity for harming others.

**Indeed, less than three months after his arrest for the instant offense and subsequent release, state authorities arrested the defendant for serious charges. PSR ¶ 60. Approximately thirty minutes before his arrest, General sent his supervising probation officer a text message stating that his brother was having a seizure and that he was taking him to the hospital. Instead of going to the hospital, the defendant is alleged to have instructed his brother, Jamel General, to drive him downtown where he then engaged in a serious assault. Although the state charges remain pending, the case involves allegations that the defendant attempted to strangle a female with whom he was romantically involved as she left work. Occurring on a public street, the alleged assault was witnessed by others. The witness also gave a statement, notably stating that General grab her arm and then grabbed her by the neck hard enough to prevent her from breathing. General also attempted to bring the victim with him and to curtail her ability to speak with law enforcement. The recitation of events from the witnesses and the victim are consistent. Significantly, these alleged events occurred not only while the defendant was on pretrial supervision, but while he was on location monitoring and home detention. During the events of May 27, 2019, the defendant is also alleged to have attempted to flee from the police and resisted arrest in the process, requiring officers to forcibly subdue General in order to take him into custody.**

**The defendant's role in the instant offense is also significant consideration. The defendant directly distributed substantial quantities of**

narcotics for his own profit. For instance, he repeatedly distributed 500 grams of cocaine to his narcotics customer, Earlene Dudley. In addition, while not the leader, manager or supervisor of the DTO, General worked closely with the DTO leader, Anthony Whyte. Intercepted communications repeatedly evidenced Whyte giving General instructions regarding to whom to sell narcotics. The two had repeated discussions concerning General's distribution of narcotics on Whyte's behalf, including conversations about particular customers would be coming to purchase narcotics, the prices particular customers needed to pay for the narcotics, and updates regarding outstanding narcotics available for distribution by General at Whyte's direction. When Whyte was out of the District arranging the purchase of narcotics, General distributed narcotics in Whyte's absence.

For instance, on December 7, 2018, at 13:30 EST in session 3213 intercepted over a phone utilized by Whyte and identified in the investigation as Target Telephone-3, Whyte spoke to General. During the call, the following conversation occurred:

> RG: Yo!
> AW: Yo!
> RG: You at the crib?
> AW: Um-hum.
> RG: [Coughs] How many uh..., little ones left?
> AW:: Mmm... The real, real, little, little, little, little ones?
> RG: Yeah, yeah, yeah. Yeah.
> AW: Mmm... There's a whole lot.
> RG: Alright. So [U/I] 'bout to say; "What do you want?" He said; "I want them all." "Alright, what do you want?" [Chuckles]
> AW: I think there's maybe three... Maybe three five Zero.
> RG: Alright, I'm heading there right now.

>   AW: Hum?
>   RG: I'm heading back right now.
>   AW: Alright.
>   RG: I'll hit you right back.

Based on their training and experience, law enforcement believe that in the conversation set forth above, General contacted Whyte to determine their narcotics supply ("how many uh…,little one left"). After Whyte confirmed that General was asking about the individual baggies of narcotics ("the real, real, little, little, little, little ones"), Whyte informed General that there were approximately 350 ("maybe three five zero") baggies remaining at Whyte's location. General then indicated that he was coming to Whyte's apartment complex to retrieve narcotics ("alright, I'm heading there right now").

On December 21, 2018, at 13:00 EST in session 5712 intercepted over Target Telephone-3, Whyte spoke to General. During the call, the following conversation occurred:

>   RG: Bring me that shit, I'm about to go see that nigga right now anyway.
>   AW: Ahm, Menito Menito
>   RG: Menito Bar right? I forgot the name. I"m about to go see the man but I'm about to go out [U/I] anyway. You at the crib?
>   AW: No I'm picking up Jadsie then I'm coming back.
>   RG: There's ay, uh, Zip there?
>   AW: Who?
>   RG Zip?
>   AW: Shoe?
>   RG: No Zip.
>   AW: Yeah there is five zero there.
>   RG: Alright.
>   AW: Cause I just did but it ain't ready yet.
>   RG: Alright alright.
>   AW: Mmm.

Based on their training and experience, law enforcement believe that in the

conversation set forth above, General contacted Whyte to obtain narcotics so that General could distribute the narcotics to an unspecified third party ("bring me that shit, I'm about to go see that nigga right now anyway"). After Whyte indicated he was unavailable ("no I'm picking up Jadsie then I'm coming back"), General inquired whether Whyte had a "zip," a coded reference for an ounce of narcotics. Whyte responded that he had "five zero," believed to be a coded reference for 50 grams of narcotics available for General to redistribute.

During Whyte's travels outside the District to Florida from January 2, 2019 until January 10, 2019, intercepted communications evidenced that General was distributing narcotics on Whyte's behalf. Intercepted communications, combined with the pen register data for another phone usually held by Whyte and identified in the investigation as Target Telephone-6, indicate that General had Target Telephone-6 while Whyte is in Florida. For instance, on January 7, 2019 at 17:01 EST in session 8829 intercepted over Target Telephone-3, Whyte spoke to General. During the call, the following conversation occurred:

> RG: Yo.
> AW: Hey, yo! You remember the dude from Waterbury with shorty?
> RG: Yeah.
> AW: Do you have one hundred?
> RG: Uh, yeah.
> AW: To spare? Like you... If you... Will you be okay for tomorrow? Cause I was... Right now, having so much of a difficulty over here, bro'. I'm not... Still here. It don't even look like I'm leaving even tomorrow. Probably Wednesday.
> RG: Then, hell no. She could take half of that. Cause that'll leave me with at least two.
> AW: Alright. So, then you [Stammering], definitely tell'em, I give him half until I get there. They suppose to give you at least three four, 34.
> RG: Okay.

11

> AW: But I'm calling him... [Voices Overlap].
> RG: Yo, everybody, everybody... I just wanted to ask you, everybody on your number, is on my number too?
> AW: No. What you mean on your number? (Pause)
> RG: Alright.
> AW: What you talking 'bout? No, they have to pay. They [Stammering] not even suppose paying 34. They suppose to be paying mine... She's suppose to be having my number, but I don't do that. You zimmie [understand]? She suppose to have my number. Because that's Big Man's people. He linked me to them and she go see them. She the one that go across to... [Voices Overlap]
> RG: Oh. Alright, but I'm saying like. I'm saying like fucking Barry.
> AW: Barry's not on your number. What are you talking about?
> RG: Alright.
> AW: What is he... What is Barry giving you?
> RG: One and a quarter. (Pause) For the little.
> AW: Uh... No! Barry suppose to be giving you one, five, zero. (Pause) Let me... You know what let me call him. Let me call him.
> RG: Yeah, because it been... It been... It's him... Him and the nigga Cream and this nigga too. [Voices Overlap].
> AW: Hell no. You crazy? [Voices Overlap].
> RG: This nigga got one, four. Gave me. Gave me five, but he said he already talk to you [U/I]. [Audio Glitch],
> AW: Who? [Voices Overlap]
> RG: Nigga, Ron G.
> AW: Yeah. Okay.
> RG: Um... This nigga got 10. [Voices Overlap]
> AW: [U/I].
> RG: That nigga got 10 and gave me three, 40.
> AW: Nah, this... Nah... [Audio Glitch] Yo, they [Stammers] playing games right now. Okay, said Barry, Cream, and who else?
> RG: Nah. That's it. [Audio Glitch] Um, Ron G. already talked to you.
> AW: Oh, yeah, Ron G. So, Barry and Cream. I'm calling them right now. [Audio Glitch].
> RG: Alright.
> AW: Alright.

**Based on their training and experience, law enforcement believe that in the conversation set forth above, General and Whyte discussed the different prices other redistribution customers pay Whyte for narcotics. Whyte told General to charge a customer at least three four, believed to be $34 per gram of cocaine**

12

("supposed to give you at least three, four, 34"). General then asked if everyone was paying Whyte the same price for narcotics that General pays Whyte ("everybody on your number, is on my number too"). Whyte clarified that an unspecified female third party, believed to be Silva, was supposed to pay the same price that Whyte pays because she is acting a courier for Whyte and Marquez, referred to as "Big Man's people" ("she suppose to have my number. Because that's Big Man's people. He linked me to them and she go see them. She the one that go across to…"). Whyte and General then discussed the price "Barry," pays Whyte for narcotics with General asking if Barry should pay $125 for the "little," a coded reference to an eight-ball of cocaine, or eighth of an ounce of cocaine, and Whyte clarifying that Barry was to pay $150 for an eight-ball of cocaine General then explained that Barry and "Cream," an alias for Forbes, told General that WHYTE charged them $125 ("Yeah, because it been... It been... It's him... Him and the nigga Cream and this nigga too"). General also stated that another customer, "Ron G." got "10 and gave me three, 40," meaning that he paid $340 for 10 grams of cocaine. Whyte expressed his disbelief and opinion that the others, Barry, Cream (Forbes), and Ron G. were "playing games," as Whyte was out of town. During surveillance, officers observed General meet with Forbes on January 7, 2019 at approximately 19:19 EST. At approximately 21:38 EST, officers also observed General met with an unidentified male associated with Silva.

Similarly, on January 7, 2019, at 17:37 EST in session 8844 intercepted over Target Telephone-3, Whyte spoke to Forbes. During the call, the following conversation occurred:

> AF: Yo.
> AW: Yo.
> AF: [UI].
> AW: Yeah, but he said that's not what you been giving him.
> AF: Who?
> AW: Who you [UI].
> AF: Nah. [UI]. Straight. [UI].
> AW: I don't know. He just called me and said. [UI]. I don't know thirty four, thirty shit like that.
> AF: [UI]. gave me five point five. [UI]. I gave him three eighty. [UI].
> AW: Alright. [UI]. Let me call you back.
> AF: Alright.

Based on their training and experience, law enforcement believe that in the conversation set forth above, Forbes and Whyte discussed a narcotics transaction that was to occur between Forbes and General, who was distributing narcotics on Whyte's behalf while Whyte was in Florida. Based on contact between Target Telephone-6 and Forbes' telephone number evidenced on the pen register for Target Telephone-6, law enforcement believed Forbes intended to meet General as discussed in the call between Whyte and Forbes intercepted in session 8844. Surveillance at Whyte's apartment complex observed Forbes arrive at the complex at approximately 19:19 EST. Surveillance observed FORBES depart the complex at 19:22 EST. Given the discussion between Whyte and Forbes captured in session 8844, the telephone contact between Forbes and General (who was holding Target Telephone-6 while Whyte was in Florida), and Forbes' brief travel to Whyte's apartment complex, law enforcement believe

Forbes and General conducted a narcotics transaction as discussed in session 8844.

We also intercepted communications evidencing General's control and access over the primary distribution location-the apartment complex-notably through his access to the keys to the unit(s) and his access to the unit(s) when Whyte was not also at the apartment complex. For instance, on January 8, 2019, at 12:30 EST in session 8940 intercepted over Target Telephone-3, Whyte spoke to General. During the call, the following conversation occurred:

> AW: Hello.
> RG: Yo!
> AW: Yeah.
> RG: I just did the crazy fuck shit, man.
> AW: What?
> RG: I don't fuck around and locked the fucking keys in the crib.
> AW: On the other side?
> RG: U/I, man.
> AW: Oh.
> RG: And Amy not even fucking here and I don't think this nigga even got a key.
> AW: Yeah, nobody got a key for there.
> RG: I know. [Whispers] Oh my God! I gotta try and do it with this card and shit but I don't want nobody seeing me. [Sighs]
> AW: In that one there? Difficult! And you got that... I don't know if with the card or what you ain't... That one there is difficult.
> RG: Fuck, man! I just U/I up those stairs to see... I don't even know why I walked U/I, I know that nigga ain't got one.
> AW: Yeah, Taylor don't got that...The only per.
> RG: It's Amy. I remember we made sure of that.
> AW: Yeah.
> RG: But I think she's... I don't even think she ever put that shit with her key ring. I think that shit is in her office but I don't think nobody can get in her office.
> AW: Oh. No, they have keys. They... No, they got keys to her office.
> RG: Well, I think that one is in her office. I'm 'bout to ask him cause... but I don't think nobody here cause it's only Jay in there... [Voices Overlap]
> AW: Yeah but... And that's the thing, I don't... I ain't want nobody... You

>know what I mean?
>RG: Yeah. No, no, no. I don't want nobody knowing that shit either. That's why I ain't even talking about. As far as she think, she think... it's your crib too, nigga. she don't think U/I. You know what I mean?
>AW: Huh-hum.
>RG: Fuck! I'ma try this card. U/I. [Background: Noise]
>AW: Alright. Let me know if you get in there.
>RG: Alright.

Based on their training and experience, law enforcement believe that in the above conversation, General contacted Whyte after General accidentally locked his keys inside unit #13, one of the units in the apartment complex ("I don't fuck around and locked the fucking keys in the crib"). Law enforcement also believe that Whyte's assertion, "yeah, nobody got a key for there" followed by "Yeah, Taylor don't got that...The only per" and General's reply, "It's Amy. I remember we made sure of that," evidences that Sarcia and Whyte restrict access to the unit but that General could obtain a key from Sarcia ("Amy").

   At 12:43 EST in session 8943 intercepted over Target Telephone-3, Whyte and General spoke again with the following conversation occurring:

>RG: Yeah, I'm good.
>AW: Oh, alright.
>RG: Yeah, cause her mother fucker O... She not here, but the office door is open for Jenny. So I'm like; "Yo, man. I need a key. I got a key, you know I mean, in his crib. I left my house keys, car keys everything in his crib." She's like... I'm like; "Your office door open." She's like; "Well tell Jenny to go give you uh..., HN   key." I'm like; "Yup! That shit sure did work."
>AW: Oh, so she had what, HN key in there?
>RG: Yup!
>AW: Oh, okay.
>RG: I'm bringing it back to her right now.
>AW: Alright.
>RG: Alright.

Based on their training and experience, law enforcement believe that in the

16

conversation set forth above, General contacted Whyte to let Whyte know that he had contacted Sarcia and obtained access to the unit via a key from a third party identified as "Jenny," who was in Sarcia's office.

Further, the Government believes it is relevant that law enforcement seized not one but ten firearms from a safe maintained and controlled by Whyte. While the Government does not seek to connect General to these firearms, it is undeniable that the firearms were located in a safe that contained almost a kilogram of cocaine, along with heroin and fentanyl, and that the safe was inside an apartment utilized by the DTO to distribute narcotics. The presence and accessibility of these firearms underscores the nature of this DTO in which General was deeply entrenched, as well as the undeniable risk of violence that stems from the unlawful narcotics trade.

Finally, the goals of deterrence, promoting respect for the law, and the need to provide just punishment are also important. The longest sentence the defendant has received to date is a three-year sentence imposed in 2004 for his larceny in the second degree conviction. PSR ¶ 53. Yet as evidenced by the instant offense and his arrest while on pretrial release, the defendant was not deterred from criminal conduct. Additionally, the need for general deterrence is even more acute given the nationwide drug epidemic. This problem has impacted almost every town and every income bracket. Although the arrest and prosecution of individuals involved in narcotics distribution, such as the defendant, will most certainly not have an immediate impact the federal

incarceration of those who distribute these substances can send a powerful message.

## Conclusion

For the reasons stated above, the Government requests that the Court impose a Guidelines sentence.

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY

*/s/ Natasha M. Freismuth*
NATASHA M. FREISMUTH
ASSISTANT U.S. ATTORNEY
Federal Bar No. phv05772
157 Church Street, Floor 25
New Haven, CT 06510
203-821-3700

## CERTIFICATE OF SERVICE

     I hereby certify that on July 16, 2020, a copy of the foregoing was filed electronically, and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system, or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.

                              */s/ Natasha M. Freismuth*

                              **NATASHA M. FREISMUTH**
                              **ASSISTANT U.S. ATTORNEY**